William C. MARSHALL, Barney Hopkins, August Scholle, Alexander D. Fuller and Charles A. Rogers, Plaintiffs,

v.

James M. HARE, Secretary of State of State of Michigan, Defendant,

and

Frank D. Beadle, John W. Fitzgerald, and Paul C. Younger, Senators of the State of Michigan, and Stanton S. Faville, Chief Assistant Attorney General of the State of Michigan, Intervening Defendants.

Civ. No. 24013.

United States District Court
E. D. Michigan, S. D.

March 16, 1964.

Judgment Reversed June 22, 1964.

See 84 S.Ct. 1912.

Theodore Sachs, Rothe, Marston, Mazey, Sachs & O'Connell, Detroit, Mich., for plaintiffs.

Frank J. Kelley, Atty. Gen. of State of Michigan, and Robert A. Derengoski, Sol. Gen. of State of Michigan, Lansing, Mich., for defendant.

Edmund E. Shepherd, Foster, Campbell, Lindemer & McGurrin, Lansing, Mich., R. William Rogers, Patrick J. Ledwidge, and George B. Martin, Dickinson, Wright, McKean & Cudlip, Detroit, Mich., for intervening defendants Beadle, Fitzgerald and Younger.

Stanton S. Faville, Chief Asst. Atty. Gen. of State of Michigan, James R. Ramsey and Russell A. Searl, Asst. Attys. Gen. of State of Michigan, Lansing, Mich., for intervening defendant Faville.

KAESS, District Judge.

On June 20, 1963, the Board of State Canvassers certified that the vote on the Constitution proposed by the Michigan Constitutional Convention was 810,860 to 803,436 in favor of adoption. On June 21, 1963, this suit was brought to declare the provisions relating to the apportionment of the legislature, Mich. Const.1963, Art. IV, §§ 2–6, invalid under the Fourteenth Amendment. The plaintiffs are Michigan citizens and qualified electors residing in Wayne County, Oakland County, and Muskegon County. The allegations of the complaint are that the provisions of the Michigan Constitution are irrational, are invidiously and purposefully discriminatory, and grossly impair the right to vote of the plaintiffs and other Michigan citizens similarly situated.

The plaintiffs have urged the invalidity of any plan of apportionment adopted in accordance with the provisions of the Michigan Constitution. The defendant, the Michigan Secretary of State, has joined in the presentation of the plaintiffs' case, and left the defense of the Michigan Constitution to the intervening Senators and Chief Assistant Attorney General. The defendant has suggested, however, that it would be premature to consider the constitutional questions presented until a definite plan of apportionment has been adopted.

Various plans proposed by members of the Commission on Legislative Apportionment have already been submitted to the Supreme Court of Michigan. The responsibility of determining which plan complies most accurately with the requirements of the Michigan Constitution now rests with that Court. Mich.Const.1963, Art. IV, § 6. While constitutional questions must be considered on the basis of specific facts and not abstractly, it is of grave concern to us that the processes of state government may be interrupted through prolonged litigation. No plan of apportionment has been adopted, yet the tendency of the provisions of the Michigan Constitution can be foretold, and the degree of departure from the principle of equal population accurately predicted.

In accordance with the decision in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, we hold that we have jurisdiction of the subject matter of the constitutional claim asserted in the complaint, that the plaintiffs have standing, and that we are not to be deterred from granting appropriate relief by the argument that the claim presents a political question.

The Michigan Constitution provides for a House of Representatives apportioned on the basis of population, subject only to the qualifications that county lines are to be followed in the creation of districts and that counties having a population of not less than 0.7% of the population of the state are to be accorded separate representation. By statistical tests it may be shown that the districting set forth in the Senators' Map II A–2 embodies the principle of equal population most faithfully while adhering to county lines. Three classes have been established in our analysis—the five most

populous counties, the remaining counties of the southern part of the Lower Peninsula, and the counties of the Upper Peninsula and the northern part of the Lower Peninsula.

Wayne County, as the center of the Detroit metropolitan area, stands apart. It has 34.08% of the population of the state, nearly four times the population of the next most populous county. Together the five most populous counties have 57.52% of the population of the state, the remaining counties of the southern part of the Lower Peninsula 33.58%, and the counties of the Upper Peninsula and the northern part of the Lower Peninsula 8.90%. Muskegon, Kent, Montcalm, Isabella, Midland, and Bay Counties have been selected to form a line dividing the Lower Peninsula. To the north of the line, the density of population falls sharply and there are distinct changes in climate and fertility of the soil and in the activities and income of the people.[1]

By reference to Table I it may be seen that the effect in districts created in the five most populous counties would be minimal. The effect would be appreciable only in districts created in less populous areas. In the district for Ottawa County (No. 19, Senators' Map II A–2) and the district for Shiawassee and Livingston Counties (No. 22, Senators' Map II A–2), the degree of under-representation, expressed as a percentage of the ratio of representation, would be 38.8% and 28.9% respectively. The degree of over-representation would be an average of 28.9% for the districts created in Monroe County (No. 30, Senators' Map II A–2), 32.0% for the district for Van Buren County, and 18.8% for the district for Allegan County (No. 25, Senators' Map II A–2). The ratio of the population of the most populous district to that of the least populous will exceed two to one, since the ratio of the population of Ottawa County, 98,719, to that of Van Buren County, 48,395, will exceed two to one.

It is a matter of general knowledge that county lines continue to have significance for persons who live in less populous areas. The county seat will be a focal point of political organization, and will often be the market place and the social and economic center of the surrounding countryside. There the county remains a natural unit of apportionment. In the great metropolitan areas, the county may assume greater importance than it has ever had as cities are transcended. The model for local government in the future may be the City and County of Los Angeles.

Authority to depart from the county line could create significantly more complex issues in districting. Not only could heretofore unrelated townships, villages or cities be combined, but they could be combined, for this one purpose, in a manner that cut across existing relationships in the manifold matters of local government. Of particular significance, authority to depart from county lines could lead to a patchwork or an impasse in the Commission on Legislative Apportionment. Thus there are strong arguments in favor of the county line.

■ The 0.7% provision permits a slight increase in the representation of persons living in sparsely populated areas. It is argued, on the one hand, that the provision is a grant of authority to the Commission on Legislative Apportionment to be exercised in its discretion, and, on the other, that it must be given full effect. Whether the provision must be given full effect is a matter of state law, to be determined by the Supreme Court of Michigan. In any event, it represents a minor departure from the principle of equal population. In Tennessee, the standard for the apportionment of the House of Representatives is the number of qualified *voters* (as opposed to population), subject to the qualification that any county having two-thirds of the ratio of representation is entitled to one

1. Districts lying on the line have been counted as districts in the northern part of the Lower Peninsula only if a majority

of the population lives to the north of the line.

member. Tenn.Const. Art. II, § 5. The Supreme Court found such a qualification minor in Baker v. Carr, supra. In Michigan, only counties having not less than seventy-seven hundredths of the ratio of representation[2] could be assured separate representation.

The effect of the provision would be appreciable, not in the most populous counties, but in the sparsely populated counties and the counties of intermediate population. At most, the representation of persons living in the Upper Peninsula and the northern part of the Lower Peninsula would be increased by two seats. The possible increase in representation would be made through a shift of one seat from Monroe County and one seat from Oakland County. Table II gives a general view of the departure inherent in following county lines and giving full effect to the 0.7% provision. By reference to Table III it may be seen that the most populous counties would still enjoy representation in the House very nearly in proportion to their population, even with a shift of two seats.

If the 80%, 20% formula is considered objectively, it will be found that it is equivalent to a formula in which greater weight is attached to population figures for sparsely populated areas, and that its effect is to increase the representation of persons living in the Upper Peninsula and the northern part of the Lower Peninsula. The mathematical precision of the formula adopted by the Constitutional Convention may be explained as a reaction to the decision reached by the Supreme Court of Michigan in Scholle v. Secretary of State, 367 Mich. 176, 116 N.W.2d 350, petition for certiorari pending before the United States Supreme Court. However, the formula is more than a recasting of the balance that existed between urban and rural areas. It represents a profound change, as it gives urban areas a clear preponderance.

### DISTRIBUTION OF SEATS IN THE SENATE[3]

| | Urban | Rural | Total |
|---|---|---|---|
| Under 1952 Amendment | 16 | 18 | 34 |
| Under new Constitution | 22 or 23 | 15 or 16 | 38 |

Most of the additional seats for urban areas will go to the five most populous counties. Wayne County will gain three, Oakland County two, Macomb County one, and Genesee County one. Kent County will lose a seat. Together, the five most populous counties will have 18 seats, while under the 1952 Amendment they had 12.

The representatives of the four most populous counties of the state will not constitute a majority of the Senate, but the representatives of the six most populous counties will. Population and representation are compared for the Senate in Table IV. In the remaining tables, the degree of departure from the principle of equal population under three possible applications of the 80%, 20% formula is presented. The degree of under representation will be 76.39% in the district for Kent County and the average degree of under-representation will be 29.52% in the ten districts created in Wayne County. Thus the ratio of the population of the most populous district to that of the least populous will probably exceed four to one.

2. The Michigan House of Representatives has 110 members, making the ratio of representation 0.9091% of the population, and 0.7% of the population is approximately seventy-seven hundredths of the latter.

3. We have employed the figures for "urbanized areas" in the 1960 Census in determining the number of districts that are urban in character. The plaintiffs have not suggested any alternative figures, and apparently do not consider the balance between urban and rural areas material.

The people of northern Michigan are placed at an economic disadvantage due to the depletion of their natural resources and the decline of some of their industries. They are far from the seat of government, far from the great concentrations of wealth and power. The difficult problems they face often are not those faced in other areas of the state.

The Upper Peninsula and the northern part of the Lower Peninsula are separate areas economically. While they are connected by a great bridge at the Straits of Mackinac, daily travel from one area to the other is not always practicable. If the principle of equal population were applied strictly, as advocated by the plaintiffs, they would have three senators to represent them in a Senate of thirty-eight. They would have nine representatives in a House of one hundred and ten. The new Constitution will increase their representation in the Senate, possibly to seven. If full effect were given to the 0.7% provision, the new Constitution would increase their representation in the House to eleven. We find entirely reasonable the belief that such an increase is necessary to assure the people of Northern Michigan an adequate voice in the legislature. Without some weighting, their interests could be ignored completely.

In our consideration of the constitutional questions, we have been guided by the analysis made by the Solicitor General of the United States in the apportionment cases argued before the Supreme Court. The three tests advanced by the Solicitor General have been adopted: (1) whether the basis for departure from the principle of equal population can be discerned, (2) whether it represents a legitimate objective in legislative apportionment, and (3) whether the principle of equal representation is subordinated to an excessive degree.

There is agreement that the first test has been met. The basis for departure from the principle of equal population can be discerned. It is not unintelligible. It was debated in the Michigan Constitutional Convention, and was known to the people when they voted in April 1963. The substantial departure in the Senate and the possibility of a slight departure in the House result from a determination deliberately made to increase the representation of the people of Northern Michigan.

The second and third tests are also met. The assurance of adequate representation to a sparsely populated and impoverished region constitutes a proper objective, and the provisions of the new Constitution do not subordinate the principle of equal population to an excessive degree. The processes of state government, we believe, should prove responsive to the needs and interests of all areas of the state.[4] The propriety of the apportionment provisions was a matter within the legislative judgment of the people of Michigan.

It has been argued that the provisions of the new Constitution permit a tyranny by the minority. In April 1963, the vote was in favor of the adoption of the Constitution. *In November 1952, the vote was against the system of apportionment now advocated by the plaintiffs.* The plaintiffs and others who share their political philosophy have demonstrated that they possess the financial resources and the experience in political action necessary to place the matter before the people at any time. The amendment of the Constitution by petition is a vital institution in Michigan and has been resorted to on numerous occasions. In addition, the matter of general constitutional revision must be placed before the people every sixteen years. Mich.Const. 1963, Art. XII, § 3. If, in the name of majority rule, we were to hold the provisions of the new Constitution invalid, after their recent adoption by a majority of the people voting on the question, and while they were subject to the processes of amendment, we would be substituting

---

4. See Comment, Baker v. Carr and Legislative Apportionments—A Problem of Standards, 72 Yale L.J. 968, 1002–1006.

for democratic institutions, a tyranny by the judiciary.

We hold the provisions of the new Constitution neither invidious nor irrational, but (bearing in mind the almost insolvable problems of theory, the contrary opinions of political and legal commentators, and the confusion of judicial authority, both state and federal) a most remarkable result, openly and fairly reached, with ample facility for correction if need therefor arises.

The action should be dismissed.

## APPENDIX

### TABLE I

HOUSE OF REPRESENTATIVES — DEPARTURE FROM PRINCIPLE OF EQUAL POPULATION THAT MIGHT BE ANTICIPATED THROUGH ADHERENCE TO COUNTY LINES

| Deviation from Ratio of Representation | Districts in Five Most Populous Counties | Remaining Districts in Southern Part of Lower Peninsula | Districts in Upper Peninsula and Northern Part of Lower Peninsula |
|---|---|---|---|
| **Degree of Under Representation (Positive Deviation)** | | | |
| 40.1% – 45.0% | | | |
| 35.1% – 40.0% | | 1 | |
| 30.1% – 35.0% | | | |
| 25.1% – 30.0% | | 1 | |
| 20.1% – 25.0% | | 2 | 1 |
| 15.1% – 20.0% | | 2 | |
| 10.1% – 15.0% | | 3 | |
| 5.1% – 10.0% | 5 | 6 | |
| 0.1% – 5.0% | 42 | 2 | 3 |
| **Degree of Over Representation (Negative Deviation)** | | | |
| 0.1% – 5.0% | 16 | 7 | 4 |
| 5.1% – 10.0% | | 2 | 1 |
| 10.1% – 15.0% | | 4 | |
| 15.1% – 20.0% | | 1 | |
| 20.1% – 25.0% | | 4 | |
| 25.1% – 30.0% | | 2 | |
| 30.1% – 35.0% | | 1 | |
| 35.1% – 40.0% | | | |
| 40.1% – 45.0% | | | |
| | 63 | 38 | 9 |

NOTE: Based on Senators' Map II A–2. Two districts on the line—the district for Osceola, Mecosta, and Montcalm Counties (No. 16, Senators' Map II A–2) and the district for Gladwin and Midland Counties (No. 10, Senators' Map II A–2)—are counted as as districts in the southern part of the Lower Peninsula.

## TABLE II

### HOUSE OF REPRESENATIVES — DEPARTURE FROM PRINCIPLE OF EQUAL POPULATION THAT MIGHT BE ANTICIPATED THROUGH ADHERENCE TO COUNTY LINES AND GIVING 0.7% PROVISION FULL EFFECT

| | Deviation from Ratio of Representation | Districts in Five Most Populous Counties | Remaining Districts in Southern Part of Lower Peninsula | Districts in Upper Peninsula & Northern Part of Lower Peninsula |
|---|---|---|---|---|
| **Degree of Under Representation (Positive Deviation)** | 40.1% – 45.0% | | 1 | |
| | 35.1% – 40.0% | | 1 | |
| | 30.1% – 35.0% | | | |
| | 25.1% – 30.1% | | 1 | |
| | 20.1% – 25.0% | | 2 | |
| | 15.1% – 20.0% | | 2 | |
| | 10.1% – 15.0% | | 3 | |
| | 5.1% – 10.0% | 14 | 6 | |
| | 0.1% – 5.0% | 42 | 2 | |
| **Degree of Over Representation (Negative Deviation)** | 0.1% – 5.0% | 6 | 6 | 1 |
| | 5.1% – 10.0% | | 2 | 2 |
| | 10.1% – 15.0% | | 4 | 2 |
| | 15.1% – 20.0% | | 1 | 2 |
| | 20.1% – 25.0% | | 5 | 4 |
| | 25.1% – 30.0% | | | |
| | 30.1% – 35.0% | | 1 | |
| | 35.1% – 40.0% | | | |
| | 40.1% – 45.0% | | | |
| | | 62 | 37 | 11 |

NOTE: Based on Senators' Map II A–3. Two districts on the line—the district for Mecosta and Isabella Counties (No. 17 Senators' Map II A–3) and the district for Gladwin and Midland Counties (No. 10, Senators' Map II A–3)—are counted as districts in the southern part of the Lower Peninsula.

## TABLE III

### HOUSE OF REPRESENTATIVES—COMPARISON OF POPULATION AND REPRESENTATION FOR THE MOST POPULOUS COUNTIES

| | Seats | Percentage of Population | Percentage of Seats in House Giving 0.7% Provision Full Effect |
|---|---|---|---|
| Wayne County | 37 | 34.08 | 33.64 |
| Oakland County | 9 | 8.83 | 8.18 |
| Macomb County | 6 | 5.19 | 5.45 |
| Genesee County | 5 | 4.78 | 4.55 |
| Kent County | 5 | 4.64 | 4.55 |
| Ingham County | 3 | 2.70 | 2.73 |
| Four Most Populous Counties | 57 | 52.88 | 51.82 |
| Five Most Populous Counties | 62 | 57.52 | 56.36 |
| Six Most Populous Counties | 65 | 60.22 | 59.09 |
| Ten Most Populous Counties | 74 | 68.95 | 67.27 |

## TABLE IV

### SENATE — COMPARISON OF POPULATION AND REPRESENTATION FOR THE MOST POPULOUS COUNTIES

| | Seats | Percentage of Population | Percentage of Seats in Senate |
|---|---|---|---|
| Wayne County | 10 | 34.08 | 26.32 |
| Oakland County | 3 | 8.83 | 7.89 |
| Macomb County | 2 | 5.19 | 5.26 |
| Genesee County | 2 | 4.78 | 5.26 |
| Kent County | 1 | 4.64 | 2.63 |
| Ingham County [a] | 1 | 2.70 | 2.63 |
| Four Most Populous Counties | 17 | 52.88 | 44.74 |
| Five Most Populous Counties | 18 | 57.52 | 47.37 |
| Six Most Populous Counties [a] | 19 | 60.22 | 50.00 |

[a] It is assumed that Ingham County has been given separate representation. See Senators' Maps II B–2, II B–3, II B–4, and II B–5. Ingham County might be joined with Clinton County. See Map II B–6. The population figures would then be slightly greater.

## TABLE V

SENATE—STRAIGHT POPULATION APPORTIONMENT—DEPART-
URE FROM PRINCIPLE OF EQUAL POPULATION THAT MIGHT
BE ANTICIPATED THROUGH ADHERENCE TO COUNTY LINES

| | Deviation from Ratio of Representation | Districts in Five Most Populous Counties | Remaining Districts in Southern Part of Lower Peninsula | Districts in Upper Peninsula and Northern Part of Lower Peninsula |
|---|---|---|---|---|
| **Degree of Under Representation (Positive Deviation)** | 80.1% – 90.0% | | | |
| | 70.1% – 80.0% | | | |
| | 60.1% – 70.0% | | | |
| | 50.1% – 60.0% | | | |
| | 40.1% – 50.0% | | | |
| | 30.1% – 40.0% | | | |
| | 20.1% – 30.0% | | | |
| | 10.1% – 20.0% | 3 | | |
| | 0.1% – 10.0% | | 8 | 3 |
| **Degree of Over Representation (Negative Deviation)** | 0.1% – 10.0% | 17 | 4 | |
| | 10.1% – 20.0% | 2 | 1 | |
| | 20.1% – 30.0% | | | |
| | 30.1% – 40.0% | | | |
| | 40.1% – 50.0% | | | |
| | 50.1% – 60.0% | | | |
| | 60.1% – 70.0% | | | |
| | 70.1% – 80.0% | | | |
| | 80.1% – 90.0% | | | |
| | | 22 | 13 | 3 |

NOTE: Based on Senators' Map II B–1. Two districts on the line—the district for Oceana, Newago, Mecosta, and Muskegon Counties (No. 18, Senators' Map II B–1) and the district for Arenac, Bay, Midland, and Tuscola Counties (No. 14, Senators' Map II B–1)—are counted as districts in the Southern part of the Lower Peninsula.

## TABLE VI

SENATE—DEPARTURE FROM PRINCIPLE OF EQUAL POPULATION THAT MIGHT BE ANTICIPATED IF 78 COUNTIES HAVING LESS THAN 13 FACTORS ARE ARRANGED INTO DISTRICTS HAVING AS NEARLY AS POSSIBLE 13 APPORTIONMENT FACTORS

| Deviation from Ratio of Representation | Districts in Five Most Populous Counties | Remaining Districts in Southern Part of Lower Peninsula | Districts in Upper Peninsula and Northern Part of Lower Peninsula |
|---|---|---|---|
| **Degree of Under Representation (Positive Deviation)** | | | |
| 80.1% – 90.0% | | | |
| 70.1% – 80.0% | 1 | | |
| 60.1% – 70.0% | | | |
| 50.1% – 60.0% | | | |
| 40.1% – 50.0% | | | |
| 30.1% – 40.0% | | | |
| 20.1% – 30.0% | 10 | | |
| 10.1% – 20.0% | 3 | 1 | |
| 0.1% – 10.0% | | 5 | |
| **Degree of Over Representation (Negative Deviation)** | | | |
| 0.1% – 10.0% | 4 | 3 | |
| 10.1% – 20.0% | | 4 | |
| 20.1% – 30.0% | | | |
| 30.1% – 40.0% | | 1 | |
| 40.1% – 50.0% | | | 2 |
| 50.1% – 60.0% | | | 4 |
| 60.1% – 70.0% | | | |
| 70.1% – 80.0% | | | |
| 80.1% – 90.0% | | | |
| | 18 | 14 | 6 |

NOTE: Based on Senators' Map II B–2. Two districts on the line—the district for Oceana, Newaygo, and Muskegon Counties (No. 19, Senators' Map II B–2) and the district for Osceola, Clare, Gladwin, Mecosta, Isabella, and Midland Counties (No. 18, Senators' Map II B–2)—are counted as districts in the Southern part of the Lower Peninsula.

## TABLE VII

### SENATE—DEPARTURE FROM PRINCIPLE OF EQUAL POPULATION THAT MIGHT BE ANTICIPATED IF 78 COUNTIES HAVING LESS THAN 13 FACTORS ARE ARRANGED INTO DISTRICTS HAVING NOT LESS THAN 10 NOR MORE THAN 16 APPORTIONMENT FACTORS—MINIMUM DISPARITY

| | Deviation from Ratio of Representation | Districts in Five Most Populous Counties | Remaining Districts in Southern Part of Lower Peninsula | Districts in Upper Peninsula and Northern Part of Lower Peninsula |
|---|---|---|---|---|
| **Degree of Under Representation (Positive Deviation)** | 80.1% – 90.0% | | | |
| | 70.1% – 80.0% | 1 | | |
| | 60.1% – 70.0% | | | |
| | 50.1% – 60.0% | | | |
| | 40.1% – 50.0% | | | |
| | 30.1% – 40.0% | | | |
| | 20.1% – 30.0% | 10 | | |
| | 10.1% – 20.0% | 3 | | |
| | 0.1% – 10.0% | | 3 | |
| **Degree of Over Representation (Negative Deviation)** | 0.1% – 10.0% | 4 | 4 | |
| | 10.1% – 20.0% | | 7 | |
| | 20.1% – 30.0% | | 1 | |
| | 30.1% – 40.0% | | | 1 |
| | 40.1% – 50.0% | | | 2 |
| | 50.1% – 60.0% | | | 2 |
| | 60.1% – 70.0% | | | |
| | 70.1% – 80.0% | | | |
| | 80.1% – 90.0% | | | |
| | | 18 | 15 | 5 |

NOTE: Based on Senators' Map II B–4. Three districts on the line—the district for Benzie, Manistee, Mason, Oceana, and Muskegon Counties (No. 6, Senators' Map II B–2), the district for Osceola, Clare, Gladwin, Newaygo, Mecosta, Isabella, and Midland Counties (No. 7, Senators' Map II B–2), and the district for Arenac, Bay, Tuscola, and Huron Counties (No. 8, Senators' Map II B–2)—are counted as districts in the southern part of the Lower Peninsula.

1000

## TABLE VIII

### SENATE—DEPARTURE FROM PRINCIPLE OF EQUAL POPULATION THAT MIGHT BE ANTICIPATED IF 78 COUNTIES HAVING LESS THAN 13 FACTORS ARE ARRANGED INTO DISTRICTS HAVING NOT LESS THAN 10 NOR MORE THAN 16 APPORTIONMENT FACTORS—MAXIMUM DISPARITY

| Deviation from Ratio of Representation | Districts in Five Most Populous Counties | Remaining Districts in Southern Part of Lower Peninsula | Districts in Upper Peninsula and Northern Part of Lower Peninsula |
|---|---|---|---|
| **Degree of Under Representation (Positive Deviation)** | | | |
| 80.1% – 90.0% | | | |
| 70.1% – 80.0% | 1 | | |
| 60.1% – 70.0% | | | |
| 50.1% – 60.0% | | | |
| 40.1% – 50.0% | | | |
| 30.1% – 40.0% | | | |
| 20.1% – 30.0% | 10 | 2 | |
| 10.1% – 20.0% | 3 | 3 | |
| 0.1% – 10.0% | | 4 | |
| **Degree of Over Representation (Negative Deviation)** | | | |
| 0.1% – 10.0% | 4 | | |
| 10.1% – 20.0% | | 3 | |
| 20.1% – 30.0% | | 1 | |
| 30.1% – 40.0% | | | 1 |
| 40.1% – 50.0% | | | |
| 50.1% – 60.0% | | | 2 |
| 60.1% – 70.0% | | | 3 |
| 70.1% – 80.0% | | | 1 |
| 80.1% – 90.0% | | | |
| | 18 | 13 | 7 |

NOTE: Based on Senators' Map II B–6. Two districts on the line—the district for Ogenaw, Iosco, Clare, Gladwin, Arenac, Isabella, and Midland Counties (No. 8, Senators' Map II B–6) and the district for Oceana, Newaygo, Mecosta, Montcalm, Gratiot, and Ionia Counties (No. 9, Senators' Map II B–6)—are counted as districts in the southern part of the Lower Peninsula.

O'SULLIVAN, Circuit Judge (concurring).

Joining in the sound opinion of Judge KAESS, I would like to add some observations as part of my concurrence. The task of this panel is to determine how far we may or should go in telling the majority of the people of a sovereign state what they can and what they cannot do. It is now our burden to find that line beyond which we may not go without arrogating to ourselves functions and prerogatives that, in the scheme of our government, do not belong to us. The power to legislate is not solely possessed by the national Congress, or State legislatures, but may be exercised directly by the people when they adopt, amend, or repeal a constitution. We recognize at once that, since Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60, and Gibbons v. Ogden, 22 U.S. (9 Wheat) 1, 6 L.Ed. 23, it is no longer debatable that the Federal government, acting through its courts, may, within permissible limits, find illegal and strike down acts of legislatures which clearly offend the United States Constitution. We need here, however, to inquire how far today's law has extended the reach of judicial veto power.

Foremost among current decisions on apportionment are Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663; Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821, and Wesberry v. Sanders, 84 S.Ct. 526 (1964). We believe that the decision we now make is consistent with these judicial landmarks. Baker v. Carr deals directly with the subject before us. Gray v. Sanders and Wesberry v. Sanders are not, in our view of controlling pertinence here. In Wesberry, Justice Black made clear that his qualified approval of the current "one man, one vote" slogan was limited to what he

said was commanded by Article I, Section 2, of the United States Constitution.[1] Wesberry deals exclusively with districts from which are chosen representatives to the United States Congress. In a footnote, Justice Black stated that, "We do not reach the arguments that the Georgia statute violates the Due Process, Equal Protection and Privileges and Immunities Clauses of the Fourteenth Amendment." (84 S.Ct. 530.)

If the Wesberry decision controlled the case at bar, we would be of the opinion that the "nearly as practicable" qualification to the "one man, one vote" principle would immunize the Michigan Constitution's apportionment of House of Representative districts from judicial attack. For the decision now required of us, we need not consider whether its apportionment of the thirty-eight senatorial districts would stand against the "one man, one vote" test. We do not believe that it is subject to such test.

We look here to be informed by Baker v. Carr. No United States Supreme Court case has yet decided that a constitution adopted by the people of a State is subject to the same attack as the enactments of their respective State legislatures.[2] Neither has the United States Supreme Court yet decided that a State will not hereafter be permitted to have either branch of its legislature apportioned other than on a strict population basis. For the decision we now make, however, we assume that a State's constitution is as vulnerable to judicial attack as the acts of its legislature.

Turning then to Baker v. Carr we do not read it as saying that the "one man, one vote" standard had to be followed by Michigan in adopting a formula for apportioning its senatorial seats. We think that its clear command goes no further than forbidding *invidious discrimination*

---

1. Justice Black said, "We hold that, construed in its historical context, the command of Art. I, § 2, that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." (84 S.Ct. 530.)

2. The Supreme Court of Michigan in Scholle v. Hare, 367 Mich. 176, 116 N.W.2d 350 (pending on certiorari sub nom. Beadle v. Scholle) did so decide.

in a State apportionment plan. A court, concluding that a particular plan is invidiously discriminatory, may declare its unconstitutionality vis-a-vis the Fourteenth Amendment of the United States Constitution. Absent such vice, a plan may be constitutional even though considerations other than strict population may have been part of the motivation for its adoption. Out of the several opinions in Baker v. Carr, come such statements as:

"The traditional test under the Equal Protection Clause has been whether a State has made 'an invidious discrimination,' as it does when it selects 'a particular race or nationalty for oppressive treatment.' * * Universal equality is not the test; there is room for weighing. As we stated in Williamson v. Lee Optical Co., 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563. 'The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.' " Douglas, concurring, 369 U.S. 244, 245, 82 S.Ct. 724, 7 L. Ed.2d 663.

"No one * * * contends that mathematical equality among voters is required by the Equal Protection Clause. But certainly there must be some rational design to a State's districting." Clark, concurring, 369 U.S. 258, 82 S.Ct. 732, 7 L.Ed.2d 663.

"Not believing that numerical equality of representation throughout a State is constitutionally required I would not apply such a standard, albeit a permissive one. * * * Moreover, there is no requirement that any plan have mathematical exactness in its application. Only where, as here, the total picture reveals incommensurables of both magnitude and frequency can it be said that there is present an *invidious discrimination*." Clark, concurring, 369 U.S. 260, 82 S.Ct. 733, 7 L.Ed.2d 663. (Emphasis supplied)

"In MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3, the Court held that the Equal Protection Clause does not 'deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former.' " Stewart, concurring, 369 U.S. 265, 266, 82 S.Ct. 737, 7 L.Ed.2d 663.

While the opinion of Justice Brennan, speaking for the Court, does not employ language of like import to the above quotations from Justices Douglas, Clark, and Stewart, we find nothing therein detracting from the validity of their observations. Justice Brennan was careful to define the reach of his decision as follows:

"In light of the District Court's treatment of the case, we hold today only (a) that the court possessed jurisdiction of the subject matter; (b) that a justiciable cause of action is stated upon which appellants would be entitled to appropriate relief; and (c) because appellees raise the issue before this Court, that the appellants have standing to challenge the apportionment statutes." Brennan, speaking for the Court, 369 U.S. 197, 198, 82 S.Ct. 699, 7 L. Ed.2d 663.

If it is now the law that no representative body—be it the United States Congress, a State legislature, a county board of supervisors, a city's council or board of aldermen, or any other representative body whose members are elected from districts—can legally exist unless there is population equality between districts, then the task of the judiciary is simple and easy. We need do no more than, by judicial command, forbid anything else.

If, however, anything other than obedience to such an easy rule is to be tolerated—if something be left to the considered judgment of the majority of a State's people or its legislatures—shall we make precise how much leeway we,

the judges, will let them have? We must, of course, strike down invidious discrimination and any other impermissible plan, such as one where inequalities arise from the race, creed or color of those affected by it. Where we find, however, that the lack of precise equality in an apportionment plan is not gross and is the product of reasonable and intelligent weighing of what is fair and conducive to the total good, shall we intrude to say that only our judgment and discretion will do? If some departure from mathematical exactness is permissible, what is the range of allowable percentages in such departures? Will 2%, 5%, 10%, 20% or 25% be acceptable to us? If the Sixth Circuit says that 10% is the outer limit, will the Seventh Circuit be forbidden to put up with 15%? Shall the discretion or political judgment of a majority of a three-judge district court control?

We think it pertinent to say that the facts in Baker v. Carr, Gray v. Sanders and Wesberry v. Sanders bear no resemblance to those which are the background to the case before us. Michigan's plan for apportioning the seats in its House and Senate will not create or tolerate any "rotten boroughs." Its 80–20 plan for the Senate and its almost precise adherence to population equality in the House exhibits intelligent and rational design and does not in any degree reveal "incommensurables of both magnitude and frequency." Baker v. Carr, 369 U.S. 260, 82 S.Ct. 733, 7 L.Ed.2d 663.

Michigan's new Constitution was not the product of hurried or partisan maneuvering, or of gradual and hidden erosion of the people's rights. The people of Michigan, by popular vote, decided to have a constitutional convention. Pursuant to that mandate, a convention was assembled. Out of that assembly's free and unfettered interchange and collision of ideas—between political scientists, practical politicians, lawyers and students of constitutional government, labor leaders, industrialists, and just plain citizens of all races and creeds—came for consideration by the entire people of Michigan a proposed constitution. The question of whether this proposed people's legislation was wise and proper was vigorously contested at the convention and during the months that followed its submission for adoption or rejection by the people. All of its provisions were exposed to the searching light of today's media of public information. Thus informed, the people of Michigan made a deliberate choice and, though the closeness of the vote portrays the vigor of the people's search for what was right, the legislation here under attack was adopted by a majority vote of the people of this State. In making this deliberate choice, every man's vote was equal to that of any other. Unless the attacked Article of the Michigan Constitution is infected with illegality, a decree, granting the relief sought by plaintiffs, would dilute and debase the vote of every elector who cast his vote with the majority. Finding no such illegality, we decline to do so.

A canvass of the vote on the Constitution discloses that its adoption did not come about through the predominant power of any part of the State over another. It does not disclose a victory of one race or creed over another; it does not disclose a victory of Republicans over Democrats;[3] it was not a victory

---

3. Wayne County, Michigan, recognized now as a Democratic stronghold, usually voting on a basis of about 65% Democratic and 35% Republican, voted in the constitutional election 245,410 for and 294,629 against the Constitution. The five most populous counties, whom the plaintiffs assert are the victims of discrimination, in total voted 441,530 for and 457,294 against the Constitution. Rural counties, which are claimed to be unfairly favored by the discrimination which plaintiffs assert is in the Constitution, in many instances voted strongly against the Constitution, and it would have gone down except for the heavy favorable vote in the urban populous counties. It might be thought that this discussion of political parties should not be mentioned. The judiciary, however, should not pretend such naivete as not knowing that politics is here involved.

of the rural over the urban, or of capital over labor; neither can we discern any influences or pressures except what are traditional in American political contesting. It is true that issues other than Article IV, Sections 2–6, played a part in the vote pattern, but the Article before us was prominent in the public discussions which preceded the voting.

No clear picture emerges from a study of the vote except that the majority of the people of Michigan made a considered and deliberate choice. For our conclusion, we assume, as plaintiffs insist, that we, the federal judges, may have the right, under some circumstances, to tell the people of Michigan that they cannot have what they chose for themselves. We are not persuaded, however, that the 1963 choice of a Constitution by the people of Michigan was a deliberate or unwitting creation of an invidiously discriminatory plan of apportionment.

The complaint should be dismissed.

ROTH, District Judge (dissenting).

With due deference to the views of my colleagues, so ably expressed in Judge KAESS' majority opinion, and in Circuit Judge O'SULLIVAN'S concurring opinion, I find myself unable to agree and therefore dissent.

The issue before the Court is whether the Michigan Constitution of 1963, so far as it pertains to the establishment and arrangement of State Senate and House districts, denies to plaintiffs, and to others similarly situated, the equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States and such other rights as are secured to plaintiffs by law. The short answer to that is that it does.

The 1963 Constitution, so far as it relates to the apportionment of the Michigan Legislature, has fatal flaws which will not pass constitutional inspection. We speak now of the Federal standards, but suggest, as we shall later explore, that it fails to pass State constitutional standards as well. But more of that anon.

The time setting of the adoption of the proposed Constitution by the convention should be noted. The convention convened October 3, 1961. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 2d 663, was handed down on March 26, 1962; Scholle v. Hare, 367 Michigan 176, 116 N.W.2d 350, was handed down July 18, 1962; and a stay order by a Justice of the United States Supreme Court issued July 27, 1962. Certain changes were submitted to the apportionment provisions of Article IV of the proposed Constitution at 11:00 o'clock the morning of August 1, 1962, the last day of the convention, despite the protestations of at least one delegate that haste might result in "irremediable error." "It must be remembered," he said, "that once the convention adjourns sine die, its powers are exhausted and, however bad an error may be, that error cannot be corrected." (Constitutional Convention Record, page 3299.)

Whether because of haste or otherwise, the provisions of the proposed, and later adopted, 1963 Constitution are in violation of the Fourteenth Amendment of the Constitution of the United States, as we shall more fully detail. The booby traps and fishhooks in its provisions respecting the establishment and arrangement of legislative districts, if given effect, result in the amendment of the proposition that:

"All men are created equal."

to

"All men are created equal—except city people."

It is true that the United States Supreme Court has, at least to this date, refused repeated invitations to interpret the nature of representative democracy in exact terms of the distribution of power among people, or to say to what degree the majority must control government. But one can legitimately and reasonably conclude from Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, 11 L.Ed.2d 481, and Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, that the Court is proceeding in the direc-

tion of a holding that "republican government" requires a popular democracy, which presupposes an equality of individuals and their voting power. Even now Baker v. Carr stands for the proposition that discrimination in apportionment will be permitted *only* if based upon a rational classification, but not if it is invidious, i. e. arbitrary or capricious.

It is submitted that the Supreme Court handwriting is on the wall, for him who will to read. Wesberry and Baker are not the last words; they are only the latest. How far that Court will go, or rather, how fast it will go, is something we have to leave to another day. It was observed by De Tocqueville some 150 years ago that the distinctive characteristic of America was a constant striving for equality.

The built-in, "fair" advantage in the 1963 Constitution is completely at odds with our concept of the equality of man. How can one justify an apportionment system which favors a segment of the population of the state? We must remember that plans of apportionment are devised by men to control the affairs of men; and remember too that men, in self-interest, are sometimes capable of rising above principle to grasp control of government. As pointed out by Judge Doyle in his dissent in Lisco v. Love, Colo., 219 F.Supp. 922, page 943:

> "Governments are devised to arrange the affairs of men. Economic interests are remarkably well represented without special representation. It is dangerous to build into a political system a favored position for a segment of the population of the state. There exists no practical method of ridding ourselves of them, and long after the institutions pass, the built-in advantage remains even though it is at last only a vestige of the dead past."

To get to the heart of the issue before us, I repeat the question I put to counsel during the oral arguments in this case:

"What is wrong with people?"

The framers of the Declaration of Independence made it the basis of our government that all men are created equal and endowed with certain unalienable rights. In doing so, they pointedly repudiated Aristotle's notion that:

> "* * * some should rule and others be ruled is a thing, not only necessary, but expedient; from the hour of their birth, some are marked out for subjection, others for rule."

The conception of political equality has been retained and reinforced throughout the history of this nation, from that Declaration, the United States Constitution, Lincoln's Gettysburg Address, and on through the constitutional amendments.

Our fundamental beliefs and the values by which we live as a nation demand an acknowledgment that men have the capacity to govern themselves, that we have faith in the rights of the individual. They cast aside the notion that our neighbor does not count, or that he counts for more or less than his neighbor.

In our scheme of government, there is no provision for, nor room for, a caste system, even of the wise and the good. Nowhere is there to be found even an intimation that some of our citizens have greater or less political capacity or power than others.

Even if we disregard, for the moment, the foundation stones of the federal government, and particularly Article IV, Section 4 of the United States Constitution, guaranteeing to every state of the union a republican form of government, and look only to the State of Michigan and its fundamental law, we find explicit recognition of the worth and value of the individual. See "An Ordinance for the government of the territory of the United States, northwest of the river Ohio," The Confederate Congress, July 13, 1787, Articles of Compact, Sec. 14, and Article II, Bill of Rights:

> "The inhabitants of the said territory *shall always be entitled to* the benefits of the writ of habeas corpus, and of the trial by jury; of *a pro-*

*portionate representation of the people in the legislature,* and of judicial proceedings according to the course of the common law."

And see also the Constitutions of the State of Michigan, 1835, 1850, and 1908, which provided for substantial equality among the people in their representation in both Houses of the State Legislature.

Both our basic federal documents and the basic state documents are premised on the basic fact of our form of government: All men are created equal. As pointed out in Giddings v. Secretary of State, 93 Mich. 1, at page 7, 52 N.W. 944, at page 946, 16 L.R.A. 402:

> "It was never contemplated that one elector should possess two or three times more influence, in the person of a Representative or Senator, than another elector in another district. *Each, insofar as it is practicable, is, under the Constitution, possessed of equal power and influence. Equality in such matters lies at the basis of our free government.* It is guaranteed, not only by the Constitution, but by the ordinance of 1787, organizing the territory out of which the state of Michigan was carved."

The majority opinion and the argument of intervenors both lay considerable stress upon the assertion that the county should be recognized as a basic unit for purposes of apportionment. Alternately, intervenors argue that history should be recognized in the consideration of the validity of the apportionment arrangement in the 1963 State of Michigan Constitution. What history? And who holds the proxy for history? Here again, Williams v. Secretary of State, 145 Mich. 447, at page 449, 108 N.W. 749, at page 750, makes it plain that the county was not then a basis of apportionment. The dissenting opinion of Mr. Justice Talbot Smith, in Scholle v. Hare, 360 Mich. 1, at page 58, 104 N.W.2d 63, at page 93, says:

> "Michigan does not employ the political unit basis."

As for the proposition that the 1963 Michigan Constitution was "solemnly" adopted by the people (by a majority of considerably less than one per cent)—to begin with, there may well be a serious question as to whether the constitutional convention was called in contravention of the Fourteenth Amendment. The 144 delegates to the Constitutional Convention, elected in April 1961, were allocated to and elected from the 110 State Representative districts and the 34 State Senatorial districts. See the Tennessee case now in the Supreme Court, West v. Carr, 370 S.W.2d 469, which raises this question:

> "Does the 1962 Tennessee Statute calling a Constitutional Convention to propose amendments to the State Constitution abridge the Fourteenth Amendment because the statute apportions convention membership on the basis of legislative apportionment formula rejected in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663?"

But let us lay aside this question. Let us turn our attention to the "Address to the People" which, according to the provisions of Act No. 8 of the Public Acts of 1961, Section 168.181 of the Compiled Laws of 1948, as amended, was to serve the purpose of:

> " * * * explaining the proposed changes in the present constitution, and the reason for such changes * * *."

In its prolegmonena, the Address adopts the statement of Professor Paul Kauper, as to the mission of the delegates:

> "To fashion a fundamental order of government that preserves the continuity of our constitutional tradition by holding fast to that which is good, but which will be adequate to meet not only today's but also tomorrow's needs * * *."

If that was the objective, then it is this writer's humble opinion that the mark was missed, for nothing is more fundamental to our form of government,

be it national or state, than equality in representation * * * of people. In its explanation to the people of the state, there was an obvious misstatement of fact, see page 5, under the heading "The Legislative Branch," paragraph 2:

"*A House of Representatives on a population basis* and a Senate on a combined population-area basis (giving 80% weight to population and 20% weight to area) with as mathematically exact a system as possible for assigning a prescribed number of seats to each chamber. The application of these formulas will bring Michigan to the forefront of the states in the fairness and equity of its system for allotting the legislative representation among its population."

It is true that under Article IV, the fine print appears. But it is unlikely that the average reader, even if he read the Address, or the proposed Constitution, could have understood, without some training in political science, mathematics, and the law, and without extensive study, the ".7%," "county lines," and "75% to 125%" provisions, to say nothing about "equal proportions." It has taken the members of this Court some considerable time to digest the meaning, in applied form, of these provisions. So that to say that the people of the State of Michigan solemnly adopted these precise provisions of the Constitution is an indulgence in rhetoric only. But even if we assume, arguendo, that they understood the implications of these provisions, it is too clear for argument that constitutional law is not a matter of majority vote. Indeed, the philosophy of the Fourteenth Amendment teaches us that it is personal rights which are to be protected against the will of the majority. And as a matter of common knowledge, the proponents of the 1963 Constitution used as a selling point, that whatever defects it might possess could and would be corrected, but that overall it was a better basic law than its predecessor. If certain provisions of the 1963 Constitution are constitutionally defective, had it been adopted by

a unanimous vote, it could not be left to stand. I take it that no one would postulate, at this late date, that because discriminatory racial legislation enjoyed overwhelming support in some of our states, it would be validated. Manifest inequality cannot be effectuated by a majority vote.

The fact of enactment of the new Constitution, even though by the slimmest of margins, generates restraint; but we cannot, true to our oath, uphold such provisions of it as are palpable infringements of the rights of individual citizens. The protection of constitutional rights is not to be approached pragmatically or expediently.

The delegates to the constitutional convention had no immunity from the United States Constitution. They were bound to be as responsive to that basic law as were the citizens who elected them. And when, as I believe to be true in this case, the mainspring of representative government is impaired, we should not preclude judicial relief. The entire thrust of today's legal climate is to end unconstitutional discrimination.

It is manifest by its very terms that the 1963 Constitution does not, as conceded by the majority, provide for a straight population formula even for the House of Representatives. If that had been the intention, it could have been accomplished easily by stopping after providing (Article IV, Section 3):

"The House of Representatives shall consist of 110 members elected for two-year terms from single member districts apportioned on a basis of population * * *."

This was not done, but the qualifications of "county lines," ".7%," and "not less than 75% nor more than 125%" were added.

It may be of significance that neither the Address to the People, briefs and arguments of intervenors, nor the majority opinion give any explanation of the magic figures ".7%," "75% to 125%," or "80–20." It seems to me that a justification

of these were, and are, in order. None has been advanced.

A review of these provisions, as well as the provision for the establishment of an apportionment commission, leaves only the guileless to assume that they were not intended to promote minority control of the legislature. These provisions, as well as those relating to the arrangement of the Senate, are not accidental and inadvertent, but calculated and purposeful.

It appears that the majority of the delegates to the convention made a legal guess that if they came *close* to a straight population apportionment in the House, they could do whatever they pleased in the matter of the apportionment of the Senate. The imbalance is not by accident, but by design. Even the apportionment commission is allotted on an area basis, and in such wise as to make it virtually certain to fail to accomplish its mission.

The end result of the whole of the provisions with respect to apportionment is a guarantee that minority rule shall prevail; and in the course of time, they could not but accentuate the discrimination toward the majority of the citizens of the state.

We cannot say what the highest Court in the land will finally say with respect to the propriety of apportioning one House of a State Legislature on a straight population basis and the other on population and/or other factors. There are those who believe that such an arrangement will meet constitutional tests. It is unprofitable to hazard a guess. But in this case, we do not have to indulge in prophecy, for neither the House nor the Senate can be apportioned on a population basis if the qualifying provisions are complied with.

There is a serious question of the validity of the provisions for apportionment from another standpoint, as so ably pointed out by Mr. Justice Eugene Black, of the Michigan Supreme Court, in his memorandum, In re Apportionment of Legislature, (1964), 372 Mich. 418 at page 449, 126 N.W.2d 731:

"The supremacy clause considered, the Constitution of each of the States has written into it, firmly as if printed before the reader's eyes, a special and controlling proviso which in so many words says that, when that State's Constitution is capable of 2 constructions, one of which would conflict with some provision of the National Constitution, the other must prevail.* Thus it is that the equality clause of the National Constitution complements and supplements and, in case of conflict, modifies to the extent of such conflict the Constitution of each of the States. The equality clause, is, indeed, 'as much a part of the laws of every state as its own local laws and Constitution.' (Blythe v. Hinckley, 173 U.S. 501, 508, 19 S.Ct. 497, 500, 43 L.Ed. 783; 180 U.S. 333, 338, 21 S.Ct. 390, 45 L.Ed. 557.)"

The provisions of Article IV of the 1963 Michigan Constitution respecting apportionment cannot be read without considering Article I, Sections 1 and 2:

"Sec. 1. All political power is inherent in the people. Government is instituted for their equal benefit, security, and protection."

"Sec. 2. No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color, or national origin. * * *"

The guiding rule of constitutional construction from the time of Chief Justice Marshall down has been that no one provision is to be separated from the others and considered alone, but that all provisions bearing upon a particular subject shall be brought into view and interpreted so as to effectuate the great purposes of the instrument. See Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511. It is necessary, therefore, to construe Article IV, together with Sections 1 and 2 of Article I, and

in the light of the requirements of the Fourteenth Amendment to the United States Constitution. So viewed, the provisions of the 1963 Constitution relating to the apportionment of the legislature cannot stand.

As a sidelight, it may be well to add that there is a serious question as to whether the proviso at the end of Article III, Section 2, squares with the guarantee clause of the Federal Constitution. The section provides that "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising the powers of one branch shall exercise powers properly belonging to another branch *except as expressly provided in this constitution.*" (Italics supplied.)

Article IV, Section 6, Paragraph 7, then proceeds to allot to the Supreme Court of the State the power to make a legislative judgment (which plan to adopt, in the event the apportionment commission does not agree), and later provides for it to trade in its legislative beret for the judicial one (paragraph 8 of Section 6 of Article IV) and apply constitutional tests. The roles are obviously incompatible.

If there is something wrong with the one person, one-vote formula of Wesberry v. Sanders, 84 S.Ct. 526, neither pleadings, briefs, nor arguments in this case tell us why. If there are valid reasons for weighting the vote of one person and shaving the vote of another, they have not been advanced. We hear the refrain that the minority must be protected. But what of the majority? What protection have they had in the legislature of the State of Michigan (and many other states) these many years, when that body has steadfastly refused to reapportion in accordance with the constitutional mandate?

The provisions of the 1963 Constitution give a preferred place in the scheme of government to the voter in the sparsely settled portions of the state. Is this because there is more space around him? Does this make him a better voter? By what constitutional or other legal rule or principle is assigned to him the right to vote the franchise granted to the millions of acres of federal and state park land and water?

Are the urban dwellers to be treated, to use Homer's words, like "dishonored strangers?" As Aristotle says:

"The citizen who is partly excluded from the honors of the state is no better than a part alien. And when this partial exclusion is concealed, the object is that the privileged class may deceive them."

What manner of men are they whose votes shall be weighted?

And what manner of men are they whose votes shall be shaved?

And who shall decide which to weight and which to shave?

It is argued that the apportionment formulae for House and Senate in the 1963 Constitution give the majority a greater representation than has been the case in the past. To say that something is not as bad as it has been is not to say that it is right. The plaintiffs in this case, and others like them, are not asking for a handout but are asserting a claimed constitutional right. This argument falls of its own weight, as does the argument that absolute mathematical precision cannot be achieved. To say that because mathematical precision cannot be attained does not preclude coming as close to it as can be every ten years, nor does it justify a greater departure from equal proportions than necessary.

The teachings of United States Supreme Court cases beginning with Baker v. Carr to the present day I interpret as meaning that an apportionment cannot be permitted which would allow a blocking of major legislation desired by the majority of the electors of the State of Michigan. Effecting the will of the majority of the people of a state must be deemed the sine qua non of any constitutional plan of apportionment. This means that at least one House of the Legislature of Michigan must be apportioned on a strict equal population basis as near-

ly as this can be accomplished, in order to meet the requirement of rationality, and to avoid any taint of invidious discrimination. It may be that it is permissible to apportion the other house on a basis which takes into account cogent and relevant factors other than population. These other factors, however, must be more meaningful than mere area; and the weight given to them should not be such as to destroy the foundation principle of majority rule, or result in invidious discrimination or irrationality in apportionment. In other words, giving effect to such other factor or factors must not be permitted to govern to such an extent that a majority of the population of Michigan is put into such an inferior position in respect to such other house that legislation needed for the good of the whole state might be blocked. No case is cited by my colleagues, by counsel, and none found by the writer, which recognizes area alone as a valid factor for apportionment purposes. The plain fact is that any meaningful, valid non-population factor invariably squares with the population distribution. Consider such matters as taxes paid, capital investments, assessed valuation of property, industry, etc. Each of these is tied irrevocably to people; area exists independent of any person.

Let us add a word about custom. The custom which emerges most clearly from a hard look at the history of Michigan is the continuous refusal of the body constitutionally charged with the duty of periodic reapportionment to discharge its constitutional duty.

As pointed out in Gray v. Sanders, 372 U.S. 368, at page 380, 83 S.Ct. 801, at page 808, 9 L.Ed.2d 821, at page 830:

"The concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications. The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions.

\* \* \* \* \* \*

"\* \* \* and, as previously noted, there is no indication in the Constitution that homesite or occupation affords a permissible basis for distinguishing between qualified voters within the State."

And see Judge Biggs' opinion in Sincock v. Duffy, D.C., 215 F.Supp. 169, at pages 187 and 188:

"Although population density, extent of agricultural and industrial development and expanding city and suburban and semi-suburban areas are deemed to be cogent factors in considering apportionment, no very persuasive factor justifying any very special treatment in the apportionment of the Senate of the General Assembly can fairly be said to lie in any purely geographical factor."

The issue for determination in this case is whether the disparities provided for and locked into the 1963 Constitution are so substantial and irrational as to constitute invidious discrimination so as to violate the equal protection of the laws—Fourteenth Amendment of the Constitution of the United States.

For the reasons I have given above, I would hold that the plan of apportionment of the Michigan Legislature, as provided for in the 1963 Constitution, with its inequalities, is not based upon a rational formula consistent with constitutional requirements, and more specifically that such plan does not provide for the districting of either House of the Legislature on a population basis, and that the Senate districting plan, calling for an area factor to be employed, is arbitrary, capricious, and constitutionally unjustified. There is here no "practical equality" with "rational deviations."

This holding, if effectuated, means that the provisions of Article IV of the 1963 Michigan Constitution, except for Section 1, the first paragraph of Section 2,

and that portion of Section 3, which reads,

"The House of Representatives shall consist of 110 members elected for two-year terms from single member districts apportioned on a basis of population,"

are constitutionally void and of no effect; that the Legislature under its general legislative powers can and should apportion both Houses of the Legislature, in accordance with federal and state constitutional standards and limits, failing which, within a reasonable time, this Court should order elections for both Houses to be held at large.